UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. MICHAEL FLANERY, | ) ) ) | |
| Plaintiffs, | ) ) | No. 8:05-CV-70-T-27-MAP |
| v. | ) ) | |
| DR. GABRIEL DECANDIDO, M.D. and GABRIEL DECANDIDO, M.D., P.A., | ) ) ) | UNITED STATES'S SECOND AMENDED FALSE CLAIMS ACT COMPLAINT |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, the United States of America, for its complaint, alleges as follows:

## INTRODUCTION

1.  In this action, the United States seeks to recover damages and civil penalties from defendants for making false claims to the United States. Specifically, defendant Dr. DeCandido defrauded the federal Medicare and Medicaid programs by over-billing for patient office visits, consultation services, services rendered at hospitals, and services rendered at nursing homes. The United States seeks recovery under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-3733, and under common law theories of unjust enrichment and payment by mistake of fact.

## JURISDICTION AND VENUE

2.  This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733, and at common law. This Court has subject matter jurisdiction over this action pursuant to

31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

3.  This Court has personal jurisdiction over the defendant, Dr. Gabriel DeCandido, because he prepared and submitted false claims to the government in and from the Middle District of Florida.

4.  Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a). Dr. DeCandido can be found, resides, and transacts business within the Middle District of Florida, and the acts proscribed by the False Claims Act occurred within the district.

## THE FALSE CLAIMS ACT

5.  The False Claims Act, 31 U.S.C. § 3729 *et seq.*, provides that any person who submits or causes to be submitted to the United States false or fraudulent claims for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the United States. The FCA empowers private persons having information regarding false or fraudulent claims to present those claims to the United States by bringing a lawsuit on behalf of the United States, which entitles them to share in any recovery. These actions are called *qui tam* actions. The FCA requires that the complaint in a *qui tam* action be filed under seal without service on any defendant. The complaint remains under seal while the United States conducts an investigation of the allegations in the complaint and determines whether to join the action.

6.  This lawsuit was initiated by Mr. Flanery as a *qui tam* action brought on behalf of the United States. Pursuant to the FCA, Mr. Flanery seeks to recover on behalf of the United States damages and civil penalties arising from false or fraudulent claims that Defendants

submitted or caused to be submitted to the United States under the Medicare and Medicaid programs. Through this complaint, the United States has partially intervened in Mr. Flanery's lawsuit.

## THE PARTIES

7. Plaintiffs in this action are the United States of America (the "United States" or "government") and Michael Flanery ("relator"). The United States files this Amended Complaint on behalf of the Department of Health and Human Services ("HHS").

8. Relator Michael Flanery worked for Dr. DeCandido's practice as a Patient Accounts Representative between August of 2002 and February of 2004. Mr. Flanery's duties included submitting claims for payment to Medicaid and Medicare.

9. Gabriel DeCandido, M.D., (Medicare Provider Number 62385C; Medicaid Number 068744800) is a family practice physician specializing in pediatrics who owns and operates the Ulmerton Clinic under Gabriel DeCandido, M.D., P.A., located at 8005 Ulmerton Road, Largo, Florida 33771. Dr. DeCandido also treated patients at nursing homes, adult living facilities, and hospitals. Approximately 80 percent of the patients treated at Dr. DeCandido's office, and almost all of the patients treated at the nursing homes, were Medicare beneficiaries. A substantial portion of the nursing home patients were also Medicaid recipients.

## THE PROGRAMS HARMED AND THEIR OPERATIONS

10. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., establishes Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of HHS administers the Medicare Program through the Centers for Medicare & Medicare Services ("CMS"), a component of HHS.

11. The Medicare Program is composed of four parts, only one of which is at issue in this case: Medicare Part B, a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule for physician and laboratory services. 42 U.S.C. §§ 1395k, 1395i, 1395x(s). Reimbursement for Medicare claims is made by the United States through CMS, which, in turn, contracts with private insurance carriers to administer and pay Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b) (1994).

12. In 1965, Congress enacted the Medicaid Act under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*. Medicaid is a federally-assisted grant program for the states which enables the states to provide medical assistance and related services to needy individuals. The Medicaid program in the state of Florida covers, among other things, the cost of physician services.

13. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operation procedures. The state directly pays physicians, with the state obtaining the federal share of the payment from accounts which draw on funds of the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The Federal share of each state's Medicaid program varies state-by-state. In Florida, at all times material herein, the federal share was between 56-59%.

14. Each state typically administers its Medicaid program through a specific state entity. That entity promulgates a Medicaid Provider Manual. By enrolling in the program, all physicians agree to abide by the Medicaid Manual. The state Medicaid manual typically

incorporates the anti-fraud provisions of the Social Security Act.

15.     The carriers and fiscal intermediaries, or the state in the Medicaid program, receive requests for payment for medical services rendered to beneficiaries.  Physicians bill for services rendered by submitting a Claim Form.  The physician furnishes and certifies to certain information on the Claim Form, including the identity of the patient, the provider number, the procedure code number, and the diagnosis.  In submitting Claim Forms, physicians certify that the information included on the Claim Form presents an accurate description of the services rendered.

16.     Given the tremendous volume of claims submitted to the carriers and the states, it is not feasible for them to obtain and review the medical record of each patient before paying a claim.  Therefore, carriers and the states generally pay on the basis of the physician's representation of the patient's diagnosis, treatment rendered, and certification included on the Claim Form.

17.     Reimbursement, however, is not permitted under any of these programs unless adequate documentation exists in the beneficiary's medical file to demonstrate the performance and medical necessity of the services rendered.  If a carrier pays a claim and subsequently discovers that the medical documentation is inadequate, the United States is entitled to deny the claim retroactively and to obtain a refund.

### THE USE OF BILLING CODES ON CLAIMS

18.     In the vast majority of cases, physicians obtain reimbursement by submitting claim forms that use standardized numeric codes to represent the services provided, rather than a narrative description.  These codes are found in the American Medical Association's ("AMA")

Current Procedural Terminology Manual ("CPT Manual"), which provides a corresponding description of medical services for each code. The claim forms also specify the identity of the beneficiary and the date of services rendered.

19. Medicare and Medicaid typically rely upon the CPT Code to determine the provider's level of service and, consequently, the appropriate payment.

20. In some instances, a single activity will have different CPT Codes, which reflect the level of service. For example, a physician may choose to bill one of five different CPT Codes for an office visit. CPT Code 99211 indicates the least comprehensive office visit while CPT Code 99215 reflects the highest level office visit. The reimbursement that the physician receives depends on the level of service provided as reflected by the code billed.

21. As a Medicaid and Medicare provider, Dr. DeCandido was required by contract and by law to comply with the applicable rules and regulations of the Medicare and Medicaid programs. Dr. DeCandido signed Medicare and Medicaid provider and participation agreements, all of which require compliance with the rules and regulations governing the Medicare and Medicaid Programs.

### DEFENDANTS' FRAUDULENT "UPCODING" SCHEME

22. Since at least 1997, Dr. DeCandido has defrauded Medicare and Medicaid through his participation in an "upcoding" scheme in which he knowingly submitted, or caused to be submitted, claims to CMS for a higher level of service than was actually provided. On many occasions, Dr. DeCandido instructed his staff to bill CMS for a CPT Code representing a high level of service when Dr. Decandido neither personally rendered the service, conferred with the healthcare provider who rendered the service, nor reviewed the patient's medical charts to

determine the extent of the service rendered. Consequently, Dr. DeCandido received greater reimbursements than he was entitled to receive for hundreds of medical procedures.

23. Dr. DeCandido employs other physicians to work in his practice, including Dr. Ingrid Zumaran, M.D., who worked for Dr. DeCandido from April of 2003 to January of 2004; Dr. Harold Hawkins, M.D. (fall of 1998 through November of 2005); and Dr. Fadi Saba, M.D. (February of 1996 through May of 1997). Dr. DeCandido also employs Advanced Registered Nurse Practitioners ("ARNP") including Barbara Dziubinski, who was employed from February of 1988 to December of 2003 and Joseph Dominic Willis, who was employed from 1998 through 2003. These physicians and ARNPs were responsible for treating patients in the Ulmerton Clinic, hospitals, nursing homes, and psychiatric hospitals. All of the aforementioned medical professionals were paid a salary.

24. Most of the physicians and ARNPs (collectively "providers") who worked for Dr. DeCandido saw patients at numerous healthcare facilities, including the Ulmerton Clinic. After rendering services to a patient, the medical professional would complete an "Encounter Form," a one page document bearing the rendering provider's name with blank spaces for the patient's name, date of service, and insurance carrier (including Medicare or Medicaid).

25. Encounter Forms also list commonly used CPT Codes, such as 99201-99205. After rendering a service to the patient, the provider would select a CPT Code on the Encounter Form and give the form to an employee in the Clinic's billing office, typically Labecca Word, who served as Dr. DeCandido's Billing Manager from June of 2001 through December of 2003, or Relator Michael Flanery, who worked as Dr. DeCandido's practice as a Patient Accounts Representative from August of 2002 through February of 2004.

26. Every day late in the afternoon an employee in Dr. DeCandido's office, usually Ms. Word, would collect the day's Encounter Forms and place them in a plastic takeout food bag. Because Dr. DeCandido also forbade employees from opening office mail, Ms. Word included the day's mail in the plastic bag.

27. Every business night, after the Ulmerton Clinic had closed, an employee would deliver the plastic bag, which was always filled with unopened office mail and Encounter Forms, to Dr. DeCandido's residence. This employee would personally deliver the bag to Dr. DeCandido or, in the event that Dr. DeCandido or his wife Pat were not home, would leave the bag at a designated spot on the front porch of Dr. DeCandido's house.

28. Upon receipt of the plastic bag and its contents, Dr. DeCandido would review the Encounter Forms that his providers had completed that day. In some instances, Dr. DeCandido altered the code selected on the Encounter Form to reflect a higher level of service. He did so without speaking to the providers who had actually delivered the services or reviewing the patients' medical charts. In many instances, Dr. DeCandido selected a CPT Code which represented a higher level of service than was actually rendered to the patient and in some instances, Dr. DeCandido assigned a CPT Code when no service was provided.

29. After reviewing, and in some cases up-coding, the Encounter Forms, Dr. DeCandido would place them back in the plastic bag which he would leave at a designated spot on his front porch. On his or her way to work the next morning, one of Dr. DeCandido's employees would retrieve the bag from Dr. DeCandido's porch and return it to the Ulmerton Clinic.

30. Upon receipt of the upcoded Encounter Forms, an employee in Dr. DeCandido's

billing and management staff, usually Ron Jarvis, relator Michael Flanery, or Labecca Word, would submit an electronic claim form to Medicare and/or Medicaid for payment based on the CPT Code that Dr. DeCandido had selected on the Encounter Form. The biller often indicated that he or she had submitted the claim by marking a long, diagonal slash on the Encounter Form. After submitting the electronic claim for payment, the biller would file the Encounter Form in the "Daily Financial" folder.

31.     Dr. DeCandido instructed his billing staff to submit claims for the CPT Codes indicated on the Encounter Forms and did not permit members of his billing staff to review patient files to verify that the level of service indicated on the Encounter Form was, in fact, provided.

32.     At least two former members of Dr. DeCandido's billing staff explained to him that federal regulations do not permit physicians to bill for a specific CPT code without first verifying that the proper level of service was, in fact, provided. Despite these warnings, Dr. DeCandido continued to select CPT Codes without consulting the providers or the patients' medical charts.

33.     Dr. DeCandido, in many instances having no knowledge of the level of service that was actually rendered, upcoded services for office visits for established patients (CPT Codes 99211-99215) and instructed his billing staff to submit claims to CMS. For example, Dr. Decandido submitted, or caused to be submitted, a claim for payment to CMS for services rendered to "Patient A" on October 24, 2003.[1] Without reviewing Patient A's medical charts or

---

[1] In the interest of privacy, this complaint will reveal neither the patients' names nor their HIC numbers. The government will serve this information on the defendant contemporaneously with the service of this Complaint and, if the Court so orders, will file this information under seal with the Court.

consulting with the physician who actually provided the services, Dr. DeCandido caused CMS to be billed under CPT Code 99215, which signifies the highest level "office or outpatient visit for an established patient." Though Patient A's medical charts are in Dr. DeCandido's possession, the United States believes that the level of service rendered to Patient A did not justify billing CMS under CPT Code 99215. A claim review revealed that from CY 1997 through CY 2005, Dr. DeCandido's practice[2] billed CMS 16,627 times for office visits for established patients; 96.1% of these charges were for CPT Codes 99214 and 99215, which indicate the two highest levels of service. The healthcare provider who actually treated Patient A told federal investigators that he rarely, if ever, provided a level of service that would justify billing CMS for CPT Code 99214 or CPT Code 99215.

34.     Dr. DeCandido, in many instances having no knowledge of the level of service that was actually rendered, upcoded services for office visits for new patients (CPT Codes 99201-99205) and instructed his billing staff to submit claims to CMS. For example, Dr. Decandido submitted, or caused to be submitted, a claim for payment to CMS for services rendered to "Patient B" on October 21, 2003. Without reviewing Patient B's medical charts or consulting with the physician who actually provided the services, Dr. DeCandido caused CMS to be billed under CPT Code 99205, which signifies the highest level "Office or Outpatient Visit for a New Patient." Though Patient B's medical charts are in Dr. DeCandido's possession, the United States believes that the level of service rendered to Patient B did not justify billing CMS under CPT Code 99205. A claim review revealed that from CY 1997 through CY 2005, Dr.

---

[2] DeCandido instructed his billing staff to submit all claims under his provider number, even services provided by his employees.

DeCandido's practice billed CMS 1021 times for office visits for new patients; 96.1% of these charges were for CPT Codes 99204 and 99205, which indicate the two highest levels of service. The healthcare provider who actually treated Patient B said that she rarely, if ever, provided a level of service that would justify billing CMS under CPT Code 99204 or 99205.

35.   Dr. DeCandido, in many instances having no knowledge of the level of service that was actually rendered, upcoded services for office and inpatient consultations (CPT Codes 99241-99255) and instructed his billing staff to submit claims to CMS. For example, Dr. DeCandido submitted, or caused to be submitted, a claim for payment to CMS for services rendered to "Patient C" on June 18, 2004. Dr. DeCandido caused CMS to be billed under CPT Code 99255, which signifies the highest level "Initial Inpatient Consultation." In fact, a review of Patient C's medical charts revealed that the services rendered did not support a claim under CPT Code 99255. A claim review revealed that from CY 1997 through CY 2005, Dr. DeCandido's practice billed CMS 7145 times for initial inpatient consultations; 92.8% of these charges were for CPT Code 99255, which indicates the highest level of service. Similarly, Dr. DeCandido's practice billed CMS 1145 times for "Office or Other Outpatient Consultations" from CY 1997 through CY 2005; while 49.8% of these billings were for CPT Code 99245, which represents the highest level of service, none of the billings were for CPT Code 99241, which represents the lowest level of service and only 0.2% were for CPT Code 99242, which represents the second lowest level of service. Healthcare providers who formerly worked for Dr. DeCandido stated that they rarely, if ever, provided a level of service that would justify the highest level of billing for patient consultations.

36.   Dr. DeCandido, in many instances having no knowledge of the level of service

that was actually rendered, upcoded hospital care services (CPT Codes 99221-99233) and instructed his billing staff to submit claims to CMS.  For example, Dr. DeCandido submitted, or caused to be submitted, a claim for payment to CMS for services rendered to "Patient D" on September 17, 2004.  Without reviewing Patient D's medical charts or consulting with the physician who actually provided the services, Dr. DeCandido caused CMS to be billed under CPT Code 99233, which signifies the highest level of "Subsequent Hospital Care."  A review of Patient D's medical charts revealed that the services rendered did not support a claim under CPT Code 99233.   From CY 1997 through CY 2005, Dr. DeCandido's practice billed CMS 84,953 times for subsequent hospital care; 38.8% of these charges were for CPT Code 99233, which indicates the highest level of service while only 12% of these charges were for CPT Code 99231, which indicates the lowest level of service for subsequent hospital care.  Likewise, a claim review revealed that from CY 1997 through CY 2005, Dr. DeCandido's practice billed CMS 5557 times for "Initial Hospital Care;" 98.1% of these charges were for CPT Code 99223, which indicates the highest level of service for initial hospital care.  Healthcare providers who formerly worked for Dr. DeCandido stated that they rarely, if ever, provided a level of service that would justify the highest level of billing for hospital care services.

37. Dr. DeCandido, in many instances having no knowledge of the level of service that was actually rendered, upcoded services rendered at nursing homes (CPT Codes 99301-99313) and instructed his billing staff to submit claims to CMS.  For example, Dr. Decandido submitted, or caused to be submitted, a claim for payment to CMS for services rendered to "Patient E" on April 12, 2004.  Without reviewing Patient E's medical charts or consulting with the physician who actually provided the services, Dr. DeCandido caused CMS to be billed under

CPT Code 99312, which signifies an intermediate level of "Subsequent Nursing Facility Care." In fact, a review of Patient E's medical charts revealed that the services rendered did not support a claim under CPT Code 99312. A claim review revealed that from CY 1997 through CY 2005, Dr. DeCandido's practice billed CMS 83,276 times for subsequent nursing facility care; 65.4% of these charges were for CPT Code 99312, which signifies an intermediate level of subsequent nursing facility care. Similarly, from CY 1997 through CY 2005, Dr. DeCandido's practice billed CMS 3791 times for "Comprehensive Nursing Facility Assessments;" 93.7% of these charges were for CPT Code 99303, which indicates the highest level of service. The healthcare professionals who formerly worked for Dr. DeCandido during the relevant time period stated that they rarely, if ever, provided a level of service that would justify billing CMS for the highest level of nursing home care services.

38.     Though she started working for Dr. DeCandido as an ARNP in February of 1988, Barbara Dziubinski was not assigned a Medicare Provider Identification Number ("PIN") associated with Dr. DeCandido's practice until June 24, 2001. Dr. DeCandido or his practice submitted, or caused to be submitted, claims for payment to Medicare for services rendered by Barbara Dziubinski before she was assigned a PIN associated with Dr. DeCandido's practice, as required by 42 C.F.R. §§ 424.502-505.

39.     Though he started working for Dr. DeCandido as a physician in the fall of 1998, Dr. Harold Hawkins was not assigned a PIN associated with Dr. DeCandido's practice until May 1, 2002. Dr. DeCandido or his practice submitted, or caused to be submitted, claims for payment to Medicare for services rendered by Dr. Harold Hawkins before he was assigned a PIN associated with Dr. DeCandido's practice, as required by 42 C.F.R. §§ 424.502-505.

40. Though he started working for Dr. DeCandido as an ARNP in 1998, Joseph Dominic Willis was not assigned a PIN associated with Dr. DeCandido's practice until January 4, 2002. Dr. DeCandido or his practice submitted, or caused to be submitted, claims for payment to Medicare for services rendered by Joseph Dominc Willis before he was assigned a PIN associated with Dr. DeCandido's practice, as required by 42 C.F.R. §§ 424.502-505.

41. Dr. DeCandido submitted claims to Medicare which falsely represented that he personally rendered services when, in fact, the services were rendered by one of his employees. In many cases, the employee who actually rendered the service had not obtained a PIN associated with Dr. DeCandido's practice, which meant that, pursuant to 42 C.F.R. §§ 424.502-505, Dr. DeCandido was not permitted to bill Medicare for services rendered by that employee. For example, Dr. DeCandido submitted to Medicare a claim for payment which represented that he personally rendered a service (CPT Code 99214) to "Patient F" on May 19, 2000. In fact, the service was rendered by an employee of Dr. DeCandido who had not obtained a PIN associated with Dr. DeCandido's practice.

42. Dr. DeCandido submitted, or caused to be submitted, to Medicare, claims for payment for services not rendered. For example, Dr. DeCandido submitted to Medicare a claim for CPT Code 99214 for services rendered to "Patient G" on September 7, 1999 for CPT Code 99214. In fact, an office visit service was not rendered to Patient G on that day.

43. Dr. DeCandido submitted, or caused to be submitted, to Medicare, claims for payment for which there was insufficient documentation of the service rendered. Pursuant to 42 C.F.R. § 424.5(a)(6), payment of a claim to Medicare is conditioned upon the provider's ability to furnish adequate supporting documentation. For example, Dr. DeCandido submitted to

Medicare a claim for CPT Code 99214 for services rendered to "Patient H" on April 18, 2003, for which he did not maintain adequate documentation of the service rendered.

44. The aforedescribed false claims fall within the statute of limitations for the False Claims Act, 31 U.S.C. § 3731(b)(1)-(2).

## FIRST CAUSE OF ACTION

### False Claims Act, 31 U.S.C. § 3729(a)(1)

### (Submission, or Causing the Submission, of False Claims)

45. This is a claim for treble damages and penalties under the False Claims Act against the defendants for knowingly presenting or causing to be presented, false or fraudulent claims to the United States.

45. Plaintiff repeats and realleges each allegation in paragraphs 1 through 44, as fully set forth herein.

46. From at least 2000 to the present time, defendants presented or caused to be presented claims for payment to the United States knowing such claims were false, fictitious, or fraudulent or acting with reckless disregard or deliberate ignorance of the truth or falsity of such claims.

47. The United States, unaware of the foregoing circumstances and conduct of the defendants, authorized payments to be made out of the Treasury of the United States to the defendants.

48. By virtue of the false, fraudulent, and fictitious claims made, or caused to be made, by the defendants, the United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a $11,000 civil penalty for each such false claim

presented or caused to be presented.

## SECOND CAUSE OF ACTION

### False Claims Act, 31 U.S.C. § 3729(a)(2)

### (Using a False Statement or Record To Get a False Claim Paid)

49. This is a claim for treble damages and penalties under the False Claims Act against the defendants for knowingly using, or causing to be made or used, a false statement or record in order to get a false claim paid.

50. Plaintiff repeats and realleges each allegation in paragraphs 1 through 44, as fully set forth herein.

51. From at least 2000 to the present time, defendants made, used, or caused to be made or used, a false records or statements to get false or fraudulent claims paid.

52. By virtue of the false, fraudulent, and fictitious claims made, or caused to be made, by the defendants, the United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a $11,000 civil penalty for each such false claim presented or caused to be presented.

## THIRD CAUSE OF ACTION

### (Payment Under Mistake of Fact)

53. This is a claim for the recovery of monies paid to the defendants under mistake of fact.

54. Plaintiff realleges and incorporates by reference paragraphs 1 through 44 as if set forth fully herein.

55. The false claims which the defendants submitted to the United States's agents

constituted misrepresentations of material fact in that they misrepresented the level of service provided the patients.

56. The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid the defendants certain sums of money to which they were not entitled and are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

57. This is a claim for the recovery of monies by which defendants have been unjustly enriched.

58. Plaintiff realleges and incorporates by reference paragraphs 1 through 44 as if set forth fully herein.

59. By directly or indirectly obtaining government funds to which they were not entitled, defendants were unjustly enriched at the expense of the United States, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

1. On the First and Second Causes of Action under the False Claims Act, as amended, for triple the amount of the United States's damages plus interest and such civil

penalties as are allowable by law, together with the costs of this action and such other and further relief as may be just and proper.

     2.     On the Third Cause of Action, for the damages sustained, plus interest, costs and such other further relief as may be just and proper.

     3.     On the Fourth Cause of Action, for the amount of the unjust enrichment, plus interest, costs and such other and further relief as may be just and proper.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General


/s/ *Brian R. Young*
JOYCE R. BRANDA
PATRICIA R. DAVIS
BRIAN R. YOUNG
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel. 202-353-2265
Fax. 202-305-4117
E-mail: Brian.young4@usdoj.gov

Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2008, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system and that the following users are registered on the CM/ECF system.

Marcos Hasbun, Esq.
Zuckerman Spaeder, LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, Fl. 33602
Tel: 813-221-1010
Notice of Electronic Filing

Barry A. Cohen, Esq.
Todd Foster, Esq.
Kevin J. Darken, Esq
Counsel for the Relator
Cohen, Jayson & Foster, P.A.
201 E. Kennedy Blvd., Ste. 1000
Tampa, FL 33602
Tel: (813) 225-1655
Fax: (813) 225-1921
Notice of Electronic Filing

Brian R. Young, Esq.
Joyce R. Branda, Esq.
Patricia R. Davis, Esq.
Attorneys, U.S. Department
Of Justice, Civil Division
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel: (202)353-2265
Fax: (202)-307-3852
Brian.young4@usdoj.gov
Notice of Electronic Filing

/s/ *Brian R. Young*
BRIAN R. YOUNG
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel. 202-353-2265
Fax. 202-305-4117
E-mail: Brian.young4@usdoj.gov
Attorney for the United States